**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

ANGELA DUNSON AND DIVENIA JOHNSON,

    Plaintiffs,

    v.

THE CITY AND COUNTY OF DENVER,
DENVER CITY ATTORNEY'S OFFICE,
KRISTIN BRONSON, in her official and individual
capacities and
MARLEY BORDOVSKY, in her official and
individual capacities,

**COMPLAINT**

**JURY TRIAL DEMAND**

**CASE NUMBER:** 23-1741

Plaintiffs Angela Dunson ("Ms. Dunson") and Divenia Johnson ("Ms. Johnson") or (collectively "the Black Women") by and through their undersigned counsel, as and for their Complaint in this action against Defendants, The City and County of Denver ("The City"), Denver City Attorney's Office ("CAO"), Kristin Bronson and Marley Bordovsky (collectively, "Defendants"), hereby allege as follows:

## I.    NATURE OF THE CLAIMS

1.    This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Ms. Dunson and Ms. Johnson, including its discriminatory treatment and harassment of these Black Women due to race in violation of the Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e *et seq.*, and The Colorado Anti-Discrimination Act C.R.S. § 24-34-402 ("CADA") and to correct unlawful employment practices on the basis of race and to provide appropriate relief to other Black female employees of the defendants The City and CAO who

have been and continue to be adversely affected by such practices.

## II.   JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981 and Title VII of the Civil Rights Act of 1964. The Court has supplemental jurisdiction over Plaintiffs related claims arising under state and local law pursuant to 28 U.S.C. §1367(a).

3.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## III.   ADMINISTRATIVE PROCEDURES

4.      Prior to the filing of this Complaint, Plaintiffs filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.* ("Title VII").

5.      The EEOC had not completed its investigation within 180 days therefore, it issued a Right To Sue letter on May 18, 2023.

6.      This Complaint and Jury Demand is being filed within ninety (90) days of receiving the Notice of the Right to Sue from the EEOC. Therefore, under 42 U.S.C. § 2000e-5(f)(1), Plaintiff has satisfied all procedural prerequisites for suing in federal court.

7.      Prior to the filing of this case, Plaintiff Johnson filed a complaint of retaliation pursuant to Title VII with the EEOC. When the EEOC completes its investigation of the charge and issues Plaintiff notice of right to sue, Plaintiff will seek leave to amend this Complaint to add claims that Defendants retaliated against Plaintiff Johnson as well.

3

8.      Any and all other prerequisites to the filing of this suit have been met.

## IV.      PARTIES

9.      Plaintiff Angela Dunson a Black woman aged 53 years old, is a resident of Denver, Colorado. At all relevant times, Plaintiff is and has been a resident of the State of Colorado and met the definition of an "employee" under all applicable statutes.

10.      Plaintiff Divenia Johnson is a Black woman aged 47 years old and a resident of Denver, Colorado. At all relevant times, Plaintiff is and has been a resident of the State of Colorado and met the definition of an "employee" under all applicable statutes.

11.      Defendant City and County of Denver (the "City") is a Colorado municipal corporation. The CAO is an agency of the Defendant City, and all actions of the CAO are the legal responsibility of the City. The City is sued on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights.  At all relevant times, The City and the CAO have met the definition of an "employer" under all applicable statutes.

12.      Defendant Denver City Attorney's Office (the "CAO") is an agency within The City. At all relevant times, Defendant CAO directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiffs, and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes.

13.      Defendant Kristin Bronson was the appointed City Attorney for the CAO. At all relevant times, Defendant Bronson directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiffs, and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes.

14.     Defendant Marley Bordovsky is the Director of the Prosecution and Code Enforcement Section ("PACE") of the CAO. Defendant Bordovsky directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes.

## V.     FACTUAL ALLEGATIONS

### A.  DUNSON PAY DISCRIMINATION

15.     Ms. Dunson was hired by the CAO as a victim advocate in May 2000. She quickly began to show her skill in creating and managing programming to benefit victims as well as supervision of staff. She was promoted to an Operational Supervisor in 2002.

16.     In 2008 a white woman ("comparable white employee") was hired to be a grant writer for the prosecution section of the CAO; her job title was Program Coordinator and she was assigned to work within the Victim Advocacy Program. She was supervised by Ms. Dunson.

17.     In 2013, the position of Program Manager of the Victim Advocacy Program was vacated and the comparable white employee applied and received the position. Ms. Dunson did not apply. The comparable white employee was then Ms. Dunson's supervisor.

18.      In 2013 when she was promoted, the comparable white employee was paid $68,023.67 a comparable salary to Ms. Dunson who had been with the office for six more years. Their salaries remained comparable until 2015 when the comparable white employee began to be treated more favorably than Ms. Dunson based on her race.

19.     Beginning in 2017 the disparity in merit raises and promotions due to decisions made by Defendant Bronson and Defendant Bordovsky based on race became more rapid and overt. Until that time, Ms. Dunson had always Exceeded Expectations in her annual reviews as did the comparable white employee.

20.     In 2017, the comparable white employee was promoted to Manager and Ms. Dunson

was promoted to the position vacated by the comparable white employee at the same time.

21.     When the comparable white employee was the Program Manager position entails two types of duties: program development and staff supervision.

22.     From the outset of Ms. Dunson's management of the program, she was undermined and shown disparate treatment by Defendant Bordovsky and her predecessor (a white male.)

23.     The Director of PACE in 2017, a white man, announced that the comparable white employee would have the title Manager of Community Relations. She was no longer the Program Manager of the Domestic Violence Program, but her duties were not well defined and she and Ms. Dunson had difficulty figuring out how her new duties differed from those of Ms. Dunson.

24.     That Director was then replaced by Defendant Bordovsky in 2018 who was charged with defining their duties. Bordovsky created overlapping duties and took duties and responsibilities away from Ms. Dunson and assigned them to the comparable white employee.

25.     None of the duties and responsibilities taken from Ms. Dunson were taken because she failed to successfully complete them. Conversely, supervision duties were taken away from the comparable white employee due to her lack of aptitude in that area and reassigned to Ms. Dunson.

26.     The comparable white employee's inability to manage people was not something for which she was given a lower annual review. In fact, she was rewarded with higher annual reviews because Ms. Dunson was now doing the direct supervision of subordinates.

27.     Plaintiff Dunson experienced the exact opposite effect: she was lowered in her review based on the duties she had taken away and not rewarded for the additional supervision she was assigned.

28.     As the years passed, Ms. Dunson's program development duties were continually undermined by Bordovsky based on Ms. Dunson's race.

29.     Bordovsky differentiated the comparable white employee's role from Ms. Dunson's stating that the white employee would be "outside" facing communicator for everything including domestic violence. Ms. Dunson, the Black woman was told she was internally facing.[1]

30.     Ms. Dunson was discouraged from engaging the public even though she was an experienced speaker. Bordovsky and the CAO ignored the fact that Ms. Dunson was elected president of the statewide victim advocacy board and she was on the board of the NAACP.[2] Both positions were platforms for her to communicate with the public.

31.     Ms. Dunson's program development duties were further undermined when the comparable white employee was instructed to attend the same meetings as Ms. Dunson. This caused confusion in the community about who was the decision-maker for the program. It also caused Ms. Dunson to feel disrespected and devalued.

32.     Ms. Dunson was not permitted to advance the goals of the victim advocacy program.

33.     In March, 2022 Bordovsky took the comparable white employee to a Domestic Violence Conference out of state. They did not inform Ms. Dunson that they were going, did not invite Ms. Dunson or ask for any input from her about what sessions they should attend. Once there, Bordovsky sent Ms. Dunson a message telling her that she and the comparable white employee were very excited to retrain Ms. Dunson's entire staff.

34.     Ms. Dunson was treated unfairly regarding supervision of staff. Throughout 2017 and lasting until 2019, Ms. Dunson and the comparable white employee were assigned almost identical supervision duties.

---

[1] Ms. Dunson communicates as a Black woman. The Manager has a white style of communication, this appears to be the only basis for the white woman to be the one to interact with the public. Research supports that white listeners will often disregard content if a speaker sounds Black. *See*, Fern L. Johnson & Richard Buttny (1982) White listeners' responses to "sounding black" and "sounding white": The effects of message content on judgments about language, Communication Monographs, 49:1, 33-49.

[2] Ms. Dunson was invited to be a part of the Board and did so as a citizen, not as the Program Manager of the Victim Advocacy Program.

35.     Each supervised courtroom staff that included victim advocates and paralegals. Ms. Dunson supervised more of both advocates and paralegals as she was responsible for three trial courtrooms while the comparable white employee supervised one arraignment courtroom. Their job duties were so similar that they were "attached at the hip" and referred to by Bordovsky, as "the hipsters."

36.     Ms. Dunson supervised more staff and yet there were constant issues with the staff supervised by the comparable white employee. Ms. Dunson would assist with meeting with team members to try and mediate.

37.     Bordovsky consistently reassigned supervision of "difficult" employees from the comparable white employee to Ms. Dunson. When the comparable white employee failed to successfully supervise her direct reports, her duties were reassigned to Ms. Dunson. But Ms. Dunson was not recognized or rewarded with either merit or reallocation.

38.     In fact, because the Manager position was a higher classification with higher pay, the comparable white employee, according to City rules, was supposed to be supervising supervisory staff, not just staff. She worked "out of class" meaning she was not supervising supervisory staff, for two years. Yet during that time, she continued to receive glowing annual reviews in which she Exceeded Expectations whereas Ms. Dunson was found to merely Meet Expectations.

39.     In March 2019, to address the problem of the comparable white employee working out of class, the supervision of Ms. Dunson, Ms. Johnson and another supervisor (three front line-supervisors) was transferred to the comparable white employee. In 2018 and 2019, while supervised by the comparable white employee (who had been until recently her "hipster,") Ms. Dunson received her first annual evaluation that did not Exceed Expectations.

40.     This supervision alignment also failed. The comparable white employee was not successfully supervising the three front-line supervisors as of March, 2020. The three front-line

supervisors were reassigned for supervision to Bordovsky. Nonetheless, in 2021, the comparable white employee was promoted again, this time to an Administrator III, the qualifications of which did not include supervisory duties. She was reallocated to the new Administrator III position on November 21, 2021 and given a raise to $110,436.[3]

41.    The CAO continually reclassified, promoted and gave glowing annual reviews to the comparable white employee while showing negative bias to Ms. Dunson with two consecutive years for which she was evaluated at lower than Exceeds Expectations and a failure to reallocate or promote her.

42.    While the CAO was working on reclassifying and promoting the comparable white employee, in July 2021, Ms. Dunson requested a pay equity review. She was summarily told that she was in the right pay range by another white member of the administration's leadership team charged with conducting equity reviews.

43.    When this white administrator told Ms. Dunson that she was not a "money bag" and could not pay Ms. Dunson more,[4] Ms. Dunson asked for the decision to be reviewed by Human Resources and without comment, explanation or transparency about how the figure was calculated, Ms. Dunson was given a $5,000 raise in October, 2021.

44.    In the years between 2017 through 2022 the disparity in pay between Ms. Dunson and the comparable white employee was now $15,000.[5]

## B.  JOHNSON PAY DISCRIMINATION

---

[3] With her merit raise on 1/2/2022 the white Administrator III was now making 114,654.66 while Ms. Dunson was making $99,311.19.

[4] The white woman Director of Administration had been given $45,000 in pay equity raises in 2018 and 2019.

[5] The pay equity issue is exacerbated by the process the CAO uses for merit raises. The white woman Director of Administration decides how much of a raise to give all the employees based on the annual evaluations. The Budget office gives a range of acceptable percentages for each rating, but the Director of Administration decides the actual percentage. It is completely opaque and arbitrary.

45.     Ms. Johnson is a Black woman. She was hired in PACE in March, 2015. She had supervisory experience prior to being hired; it was a prerequisite for the position.

46.     During the first seven months of her employment, Ms. Johnson, came to realize that she was incorrectly classified and underpaid based upon her assigned duties and responsibilities. She began speaking to her direct supervisor, a white man, about correcting this situation.

47.     She spoke to her supervisor dozens of times and sent several dozen more emails with the information that supported her request. She was denied a reallocation to a legal administrator that year because the request was not supported by the CAO, but her supervisor promised a reallocation in July 2016[6].

48.     In the meantime, white employees of PACE were reallocated and given pay equity review which resulted in increased salaries across the board for those employees.[7] This reallocation request was made by the agency on their behalf.

49.     Unlike her white co-workers, Ms. Johnson did not receive a reallocation or pay equity review in July 2016. She immediately made a complaint to the Employment Law Section of the CAO and was told by a supervisor she did not qualify for a reallocation because the CAO only had legal administrators in the Administration Section. Ms. Johnson was not assigned to the Administration Section. This was reiterated to her when she met with Bronson.

50.     Shortly thereafter, in December 2016, Bronson proudly announced that two white women, who were not from the Administration Section of the CAO, were promoted to

---

[6] A reallocation in the City system requires the support and approval of the head of the Agency for which the employee works.

[7] Pay equity reviews are done by the city to ensure that employees with the same job title or duties are being similarly compensated. Pay equity cannot result in a decrease in pay; pay can only be raised in order to equalize pay across the many agencies of the City.

Legal Administrators; their duties were similar and equivalent to Ms. Johnson's.

51.     One of the white women promoted to that position was in the Human Services Section of the CAO and started at the CAO at the same time as Ms. Johnson.[8] Her request to be promoted to Legal Administrator was supported by the CAO.

52.     She was given a raise to $78,000 per year when she was reallocated. Ms. Johnson was making $53,114.

53.     Beginning in 2017, Ms. Johnson absorbed the duties and responsibilities of a second supervisor who left PACE.

54.     Throughout 2017, Ms. Johnson continued seeking a reallocation directly with Bronson and the Director of Employment law including a request for a desk audit[9].

55.     Ms. Johnson was now performing duties which were previously assigned to two supervisors and was not being adequately recognized or compensated. The desk audit was performed and denied, but Ms. Johnson was not informed of the results for several months. Her reallocation request was denied and her concerns about pay equity and equity of title were not addressed during 2017. Neither the desk audit nor the reallocation for Ms. Johnson were supported by the CAO.

56.     In June, 2018, Ms. Johnson was making $61,932. Another agency within the City of Denver hired a new employee with the same title as Ms. Johnson at a salary of $66,040. City rules require the range of pay for her position had to be changed to accommodate that starting

---

[8] Ms. Hovland started at a higher salary than Ms. Johnson even though her prior experience was comparable. At the time of their hiring there was no central person within the CAO to make sure the initial offers were equalized. That was supposed to be corrected by the Director of Administration when she was hired in 2017.

[9] If the Agency does not support a request for reallocation which can only reallocate an employee upward, the employee is permitted to request a desk audit. In the audit, a representative from Human Resources independently reviews the work assigned to a position and may require a reallocation up or down or the classification may stay the same.

salary. Ms. Johnson was given a raise to $66,040 the new minimum also referred to as the bottom of the range. At about the same time another white woman employee of the CAO with no supervisory experience prior to her promotion, was promoted to Legal Administrator and paid $70,200.

57.     On December 23, 2018, Ms. Johnson was given a pay equity raise to $72,000, but she was never told or shown how the equity number was reached. She was finally reallocated to a Legal Administrator I August 2019, but was not given any raise in pay.

58.     Ms. Johnson's duties were substantially unchanged from 2015 through 2019 when she was reallocated except that she was doing the job of two people. As she had asserted since her first request for reallocation, her duties were substantially unchanged after her reallocation as well.

59.     It took Ms. Johnson three more years than her white counterparts to be reallocated; even then, she was not treated the same as her white colleagues. When she was reallocated to Legal Administrator I, the same position her white colleague had been reallocated to three years prior, Ms. Johnson's salary was $72,000 (more than $6,000 less than the white colleague, who started at the same time as she did, had been given when she was reallocated.) However, the disparity had grown. By 2019, the white woman was making $99,000 and had been promoted to Legal Administrator II. In the four years the two women worked for the CAO, their salary disparity increased to nearly $25,000 per year.

60.     The Director of Administration, a white woman, charged with managing pay equity in the office told Ms. Johnson: "you have gotten things with this office, I'm just sorry that you had to make more laps to get it than others."

### C.  HOSTILE WORK ENVIRONMENT; TOLERATING RACISM

61.     The CAO has created a hostile work environment by tolerating racist behavior from its employees and failing to protect its Black employees from fear and intimidation from the racist behaviors of other employees.

62.     Both Ms. Dunson and Ms. Johnson have been marginalized and silenced by the environment. Neither is able to provide exceptional work product, which affects their merit pay, because of the hostile environment.

63.     There were two high-profile incidents that highlight the CAO's failure to hold employees accountable for racist behavior and to protect Ms. Dunson and Ms. Jonson, but they are only examples and not an exclusive list.

64.     The first incident arose on December 16, 2020. The top lawyer for Denver International Airport, a white man, was at a holiday party for the airport. He decided to roleplay a Black man being contacted by police and turned and slapped a subordinate. Bronson was alerted to the incident that night. She did nothing to the white man. Instead, the victim of the slapping was told he did not have to come to work the next day if he was uncomfortable.

65.     The white man was allowed to resign several weeks later when the story was publicized by the news. Ms. Johnson and Ms. Duson read about this incident in the press. The CAO administration never addressed the incident with Ms. Johnson or Ms. Dunson or even inquire of them if they needed any support.

66.     In late 2019 or early 2020, the PACE hired a Black woman attorney. She was the only Black attorney in the section. Within six months, she resigned. At the time of the resignation, Ms. Dunson and Ms. Johnson did now know why she resigned.

67.     Some months later, in the summer of 2020, the supervisors of PACE found a chat group joined by three veteran white prosecutors. The white prosecutors used an internal

city email and messaging system to repeatedly disparage their bosses, including Ms. Dunson and Ms. Johnson, and reveled in causing the Black woman attorney to suffer a "nervous breakdown."

68.     Bordovsky and Bronson began an investigation, but allowed two attorneys, a white man and a white woman, to resign prior to disciplining them. The third attorney, a white woman, indicated that she was in an unhealthy mental state because she had been publicly dressed down by Bordovsky and that another supervisor, a white man, had texted a picture of a partially naked coworker to a group of attorneys at a conference before becoming a supervisor. Bordovsky and Bronson allowed the veteran white woman attorney to return to work after a fifteen (15) day suspension.

69.     Ms. Johnson and Ms. Dunson as well as some other supervisory staff objected to this outcome. They recommended that all three attorneys be disciplined by firing them and that Bordovsky and the white man supervisor also be disciplined; Bordovsky for her bullying behavior and the white man supervisor for sexual harassment.

70.     Neither Bordovsky nor the white man supervisor was disciplined for the incident. In fact, nothing more was done by the CAO until the case was publicized in the news in March, 2022. Upon information and belief, both Bordovsky and the white male received strong annual reviews.

71.     At that time, Bordovsky told Ms. Dunson and Ms. Johnson that they should put aside their own feelings and support the white male supervisor who felt very embarrassed by the media coverage.

72.     Bronson publicly supported the veteran white attorney and said nothing more could be done. Bronson failed to address any concerns regarding the racism of the conduct.

14

73.     Neither Ms. Dunson nor Ms. Johnson feel safe or comfortable working with the white woman attorney, and informed Bordovsky and Bronson of that, but no efforts have been made by the CAO to address that either.

## D.  HOSTILE WORK ENVIRONMENT; RACIALLY MOTIVATED BULLYING

### 1.  Ms. Johnson

74.     Ms. Johnson and Ms. Dunson have suffered repeated bullying from leaders withing the CAO related to their race.

75.     Since 2015, Ms. Johnson has been supervised by a white man, and two white women. Each in their turn have taken to ignoring her and marginalizing her.

76.     Her current supervisor, Defendant Bordovsky, consistently assigns Ms. Johnson's duties to other white employees without informing Ms. Johnson and then berates her when the duties are duplicated.

77.     Bordovsky often misses scheduled one on one meetings with Ms. Johnson. When she does meet with Ms. Johnson, fails to use that time to address any issues which arise regarding Ms. Johnson's performance. Ms. Johnson is ambushed with any issues of concern during her annual review. This has been the pattern since 2015.

78.     The never discussed incidents are used to lower her performance rating without any opportunity for Ms. Johnson to correct the issue while her white colleagues are not similarly ambushed. Her white colleagues are counselled immediately, allowed to correct issues and are generally rewarded with higher evaluations at the end of the year.

79.     Ms. Johnson has repeatedly been informed at her review that others have complained about her, these people are not identified nor is Ms. Johnson offered the opportunity

to meet with anyone who has complained.

80.     Moreover, the language Bordovsky chooses to describe incidents or communications from Ms. Johnson are laden with inappropriate language that plays into stereotypes of Black women.[10]

81.     Bordovsky excludes Ms. Johnson from meetings and decisions about the matters and people Ms. Johnson supervises. She also minimizes Ms. Johnson's contributions and ignores Ms. Johnson's efforts to advocate for her direct reports to be rewarded, promoted or to receive pay equity while fawning over the suggestions and contributions of the white members of the leadership team.

82.     Bordovsky waffles between expressing her great affection for Ms. Johnson and yelling and humiliating her. Bordovsky's outbursts are seemingly random and without warning and are most often directed at the two Black women in the Section.

83.     Ms. Johnson is excluded from other activities organized by Bordovsky as well. One example of this exclusion was when Bordovsky invited the entire leadership team to participate in fantasy football except Ms. Johnson and Ms. Dunson, the two Black women members of the Section leadership team.

84.     Bordovsky was sometimes joined by the white woman Director of Administration in bullying Ms. Johnson. When Ms. Johnson resigned from the Diversity and Inclusion Committee, they both met with her. Ms. Johnson resigned from the Diversity and

---

[10] The words, "ripped" and "terse" were used in Ms. Johnson's 2021 evaluation to describe her conduct of opening a letter and sending a note about how the sealing of envelopes violates the protocols put in place by the City's central mail room. The "terse" note in question was worded as follows: "Please do not seal envelopes. Thank you, Nikki." The note was used as part of a virtual training for the staff during the pandemic on how to follow protocols with the mail room. This incident happened months prior to Ms. Johnson's annual review, but was not brought to her attention until her review. The words terse and ripped are themselves damaging and evocative. Nobody saw the opening of the envelope and yet the words her white woman supervisor chose to describe opening the envelope and writing a note of reminder were unduly suggestive of anger and violence which is a pejorative stereotype of the angry Black woman.

Inclusion Committee due to the inconsistency of having this committee while continuing to tolerate and support racist and marginalizing behaviors in the office.[11] She was challenged by her both the white women, about how she expected to be in leadership if she would not be on the committee.

### 2. Ms. Dunson

85.     Since 2017, Ms. Dunson has been bullied by Defendant Bordovsky. She consistently talks to Ms. Dunson in a demeaning manner and tries to silence her. She embarrasses Ms. Dunson publicly and in the next breath asks her why they are not closer. She treats Ms. Dunson differently than her white colleagues.

86.     When Ms. Dunson's mother was in Intensive Care, Bordovsky called her and asked if her mother was dead. She followed up with the statement "the advocates are saying your mother is dead, … I should be the first to know if she dies." When white colleagues have suffered loss within their families, Defendant Bordovsky has been kind and has instructed Ms. Dunson to "give them grace."

87.     When Ms. Dunson asked about why she was excluded from a Domestic Violence Conference with Bordovsky, Bordovsky responded angrily that she had paid for her own expenses and closed the conversation.

88.     Ms. Dunson is not allowed or encouraged to have open communication with

---

[11] Explanation in Email from Ms. Johnson resigning from the Diversity Committee: "Hi Linda and Marley, I have given this some thought and am no longer able to be part of PACE DEI work. At this time, I do not feel that I can be effective on this committee in light of recent decision to hire Dan in light of accusations that Dan is inequitable (Angela feeling discounted) and the issues (the picture taken of him) that surrounded Dan with respect to Eric, Emily, and Kristie. My decision is largely due to the fact that I am struggling to support a committee that focuses on DEI work when I do not feel my voice nor Angela's voice was heard with respect to promoting someone whose behavior does not represent the values that are being espoused by the CAO, but yet the individual is being promoted.  I will be able to work with him professionally as I am not speaking to his whole character, but I am speaking to his behaviors.  Thanks for your understanding.

Bordovsky in stark contrast to the other white members of the leadership team.

## VI.    CLAIMS FOR RELIEF

### A.  FIRST CLAIM FOR RELIEF against all Defendants
**DISCRIMINATORY TREATMENT BECAUSE OF RACE IN VIOLATION OF Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e *et seq*.**

89.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

90.    During Ms. Dunson's and Ms. Johnson's employment, Defendants engaged in unlawful discriminatory employment practices by discriminating against them with respect to the terms and conditions of their employment based on their race (African American).

91.    The unlawful employment practices include, without limitation, disparate treatment, and direct discrimination in pay and disparate impact of some employment practices that impact Plaintiffs.

92.    The effect of these practices deprived Plaintiffs of equal employment opportunities and otherwise adversely affected their employment status because of their race.

93.    These unlawful employment practices were intentional.

94.    The unlawful employment practices were undertaken with malice or with reckless indifference to Ms. Dunson's and Ms. Johnson's federally protected rights.

### B.  SECOND CLAIM FOR RELIEF against all Defendants
**DISCRIMINATORY TREATMENT BECAUSE OF RACE IN VIOLATION 42 U.S.C. §1981**

95.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

96.    During Ms. Dunson's and Ms. Johnson's employment, the Defendants engaged in unlawful discriminatory employment practices by discriminating against them with respect to the terms and conditions thereof.

97.    The unlawful employment practices include, without limitation, disparate

treatment, discipline, and harassment, and false accusations all because of Plaintiffs' race (African American).

98.     The effect of these practices deprived Ms. Dunson and Ms. Johnson of equal employment opportunities and otherwise adversely affected their employment status because of their race.

99.     These unlawful employment practices were intentional.

100.    The unlawful employment practices were done with malice or with reckless indifference to Ms. Dunson's and Ms. Johnson's federally protected rights.

### C.  THIRD CAUSE OF ACTION against all Defendants
### DISCRIMINATORY TREATMENT BECAUSE OF RACE IN VIOLATION OF the Colorado Anti-Discrimination Act C.R.S. § 24-34-402 ("CADA")

101.    Plaintiffs incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

102.    Defendants have discriminated against Plaintiffs in violation of the Colorado Law Against Discrimination by subjecting them to disparate treatment because of their Race (African American) by, *inter alia,* consistently paying them less than their white colleagues and giving them less responsibility and less visibility than their white colleagues.

103.    As a direct and proximate result of the Defendants' unlawful discriminatory conduct in violation of the Colorado Law Against Discrimination, Plaintiffs have suffered and continue to suffer financial and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

104.    Defendants' unlawful discriminatory conduct constitutes a willful and wanton violation of the Colorado Law Against Discrimination, was outrageous and malicious, was

intended to injure Plaintiffs, and was done with reckless indifference to Plaintiffs' civil rights, entitling Plaintiffs to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against

Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Colorado;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An order directing Defendants to place Plaintiffs in the position they would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of them, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiffs;

D.      An award of damages in an amount to be determined at trial to include lost pay and loss of opportunity the minimum of which will exceed $100,000, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory damages, including, but not limited to, compensation for their severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to their professional and personal reputation and loss of career fulfillment.

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.      An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs' reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 10, 2023

MDS Legal Consultants, LLC

By:      s/ Melissa Drazen-Smith
Attorney Registration #23161

8700 E Jefferson Ave, #371315
Denver, CO 80237
Phone:   303-906-1339
E-mail: drazenm@aol.com

COUNSEL FOR PLAINTIFFS